# METROPOLITAN LOAN & TRUST COMPANY *v.* SCHAFER.

PRINCIPAL AND AGENT; EVIDENCE; EQUITY; ESTOPPEL; NEGOTIABLE INSTRU-
    MENTS; CORPORATION; USURY; PAYMENT; SET-OFF; ASSIGNMENTS;
    PRIORITY; COSTS.

1. A statement by a witness that a loan was negotiated by one person "through" another person is not sufficient to show that the relation of principal and agent existed between such persons, where their positive and uncontradicted testimony is that no such relation existed between them, but that one of them dealt with the other as the principal in the making of the loan.

2. Where one stands by and sees another person selling property under claim of title, without asserting his own claim of title, he is estopped thereafter to set it up, and the one conducting the sale is also estopped to assert title.

3. Equity will not permit a person claiming equitable title to securities, to induce a holder thereof for value as an accommodation, to purchase the property sold for the satisfaction of the securities at a price far in advance of the amount invested, and then come into court to compel indemnity for the difference.

4. An agreement in a promissory note, payment of which is secured by collateral securities, that on a sale of the securities for default on

the part of the maker, the holder of the note may become the purchaser of the securities. is valid; and the agent of the holder may purchase for his principal.

5. Where officers of a corporation act as agents of the corporation, the latter is liable for their acts, but the corporation is not liable for their acts when they are acting on their individual account.

6. A defense of usury, good against one obligation, will not constitute a valid offset against a distinct and independent obligation, though between the same parties.

7. The law will not make an application of a payment when the parties have already done so, as to do so would be to make a new contract between the parties; and this rule applies even in the case of an application of money to the payment of an item in an account current which is not recoverable in an action at law.

8. If an action is brought on the principal debt after the payment of usurious interest, such usury may be made a valid set-off against the principal debt (construing §§ 1181, 1182 D. C. Code, 31 Stat. at L. 1377, 1378, chap. 854); but before the passage of the Code the usurious interest could only be recovered by a separate action brought within one year. (Citing *Lawrence* v. *Middle States Loan, Bldg. & Constr. Co.* 7 App. D. C. 161.)

9. Usury upon obligations paid and canceled cannot be used as a set-off against a subsequent obligation between the same parties either at law or in equity, but the remedy of a party who has paid usurious interest on a debt and has failed to set it off in the enforcement of that particular debt is to recover the amount prescribed by statute as the penalty for usury.

10. The mere fact that negotiable securities sold in the open market were purchased for much less than their face value does not show usury.

11. An assignee of securities has no greater right than his assignor, nor has he priority over other claimants of the securities where their claims are based on obligations which originated prior to the assignment. (Citing *Colbert* v. *Baetjer*, 4 App. D. C. 416.)

12. Where costs incident to an intervening petition were awarded by the court below to the intervener, and this court reversed the decree which was in his favor, the costs of such intervening proceeding were ordered to be taxed against him.

No. 2808.  Submitted October 13, 1915.  Decided February 7, 1916.

HEARING on an appeal from a decree of the Supreme Court of the District of Columbia ratifying and confirming

the report of the auditor in a suit for the foreclosure of a deed
of trust.                                              *Reversed.*

The facts are stated in the opinion.

*Mr. Wilton J. Lambert* and *Mr. D. W. Baker,* for the appel-
lant the Metropolitan Loan & Trust Company, in their brief
cited:

*Second Nat. Bank's Appeal,* 85 Pa. 528; *First Nat.
Bank* v. *Denson,* 115 Ala. 650; *Anderson* v. *Phlegar,* 93 Va.
415; *Baker* v. *Humphrey,* 101 U. S. 494; *Bright* v. *Banking
Co.* 3 Pa. 478; *Barry Bros.* v. *American White Lead, etc. Co.*
107 La. 236; *Carter* v. *Carusi,* 112 U. S. 478; 31 Cyc. 1219;
16 Cyc. 680, 761; *Corzine* v. *Williams,* 85 Tex. 499; *Close* v.
*Glenwood Cemetery,* 107 U. S. 466; *Carpy* v. *Dowdell,* 115 Cal.
677; *Colbert* v. *Baetjer,* 4 App. D. C. 416; *Dickey* v. *Land Co.*
63 Md. 170–177; *Durant* v. *Banta,* 27 N. J. L. 233; *Feldman*
v. *Gamble,* 26 N. J. Eq. 494; *Fidelity, etc. Ins. Co.* v. *Roanoke
Iron Co.* 81 Fed. 450; *Farmer's Nat. Bank* v. *Venner,* 78
N. W. 540; *Hiscock* v. *Bank of New York,* 206 U. S. 28; *Junc-
tion R. Co.* v. *Bank of Ashland,* 12 Wall. 226; *Jones* v. *King,*
25 Ill. 334; *Kirk* v. *Hamilton,* 102 U. S. 68; *Lenning's Appeal,*
93 Pa. 301; *Lawrence* v. *Building Asso.* 7 App. D. C. 161;
*Lacombe* v. *Forstall's Sons,* 123 U. S. 562; *Lane* v. *Stewart,*
20 Me. 98; *Maher's Appeal,* 91 Pa. 516; *Manning* v. *Schriver,*
79 Md. 41; *Moncure* v. *Dermott,* 13 Pet. 345; *National Bank
of Illinois* v. *Baker,* 128 Ill. 533; *Northern Nat. Bank* v. *Porter
Twp.* 110 U. S. 608; *Phillips* v. *Hornsby,* 70 Ala. 414; *Polen*
v. *Palmer,* 53 Ill. App. 223; *Root* v. *Crock,* 7 Pa. 378; *Sher-
man* v. *Blackman,* 24 Ill. 346; *Taylor* v. *Breisch,* 11 Atl. 388;
*Treadwell* v. *Moore,* 34 Me. 112; *Importer's, etc. Bank* v.
*Littell,* 47 N. J. L. 233; *Troup* v. *Appelman,* 52 Md. 456.

*Mr. J. K. M. Norton* for the appellant the Modern Workmen
of the World.

*Mr. John C. Gittings* and *Mr. Justin Morrill Chamberlin,* for the appellee, John C. Gittings, assignee, in their brief cited:

*Bailey* v. *Hill,* 77 Va. 492; *Bank* v. *Hoagland,* 7 Fed. 159; *Brown* v. *Bank,* 169 U. S. 416; *Brown* v. *Slocum,* 30 App. D. C. 576; *Brown* v. *Brown,* 38 S. C. 173; D. C. Code, secs. 1180, 1182; *Collamer* v. *Goodrick,* 30 Vt. 628; *Consaul* v. *Cummings,* 24 App. D. C. 470; Cook, Corp. sec. 881; *Corcoran* v. *C. & O. Canal Co.* 94 U. S. 741; 1 C. J. pp. 631, 640; Foster, Fed. Pr. sec. 171; *Green* v. *Bishop,* 1 Cliff. 186, 191; *Haller* v. *Clark,* 21 D. C. 128; *Hood* v. *Chapman,* 19 Beav. 90; *Hutchins* v. *Munn,* 28 App. D. C. 271; Langdell, Eq. Pr. 125; *McCarty* v. *Bank,* 223 U. S. 493; *Moseley* v. *Brown,* 76 Va. 419; *Olmstead* v. *Mortgage Co.* 11 Neb. 487; U. S. Rev. Stat. sec. 5198; *Richardson* v. *Van Auken,* 5 App. D. C. 209; *Sheffield* v. *Gordon,* 151 U. S. 285, 290; *Sherman* v. *Blackman,* 24 Ill. 345; *Slack* v. *Hughes,* 71 Ill. App. 91; *Smith* v. *Trust Co.* 12 App. D. C. 199; *Waggaman* v. *Earle,* 25 App. D. C. 582.

*Mr. Justice* VAN ORSDEL delivered the opinion of the Court:

This appeal is from a decree of the supreme court of the District of Columbia confirming a report of the auditor relating to the distribution of a fund derived from the sale of real estate under a deed of trust. The trust was executed by the District Concrete Company, a corporation, to the United States Trust Company, as trustee, to secure the issue of bonds aggregating $50,000, represented by one hundred coupon bonds of the par value of $500 each, due December 1, 1919, with interest at 6 per cent, payable semiannually. Default was made in the payment of the interest, and this action for foreclosure was brought by one Phillips, a bondholder.

It was prayed in the bill that a trustee be appointed, a day fixed for the payment of the bonds, in default of which sale should be made, the priorities of the bondholders ascertained and the proceeds distributed accordingly under order of the court, and for a deficiency judgment against the concrete com-

pany in case the amount recovered should be found insufficient to pay the bondholders. A decree *pro confesso* was taken against the concrete company and the Capitol Brick Company, which was alleged to be chargeable with some of the obligations of the concrete company. The United States Trust Company, trustee, answered, averring that its sole interest was as trustee, and that it submitted its rights to the court.

Appellant Metropolitan Loan & Trust Company filed an intervening petition, in which it alleged that in course of business it had purchased, for value, $27,000 of the bond issue, and that it believed that a foreclosure of the deed of trust would not at that time be for the best interest of the bondholders, but that if sale were made it prayed that it might share *pro rata* in the proceeds thereof.

Upon sale and ratification of the report of the trustee, the court referred the matter to the auditor, with instructions "to ascertain and determine and state the validity of all bonds and interest coupons secured by deed of trust in the foreclosure of which the said sale was ordered and made, and to ascertain and state the holders thereof and what priorities between themselves, if any, should be accorded to the holders of such bonds and interest coupons;   *   *   *   and also to state the account of the trustee, and direct the distribution of the fund in the trustees' hands."

More than a year after the auditor began taking testimony under the reference, appellee Gittings intervened by petition, in which, as assignee of one Sutcliffe N. Widdup, he claimed title to forty of the bonds held by the Metropolitan Loan & Trust Company. By the terms of the assignment, Widdup conveyed to Gittings all his right, title, and interest in certain securities, among which were sixty-nine bonds of the District Concrete Company of the par value of $34,500; two real estate notes made by one Hicks, one for $10,000, and one for $10,096; a deed of trust for $2,400, and other notes. By the assignment it was agreed "that said Gittings, after collecting the value of said bonds and the said notes, or whatever may be due to me after the payment of said indebtedness, which they are pledged

to secure, to apply the proceeds thereof to the payment of all fees for professional services which he has or may have against me in any manner whatsoever, and after fully indemnifying himself for such services the amount thereof, to be hereafter ascertained, to return the balance of said moneys over to me."

Petitioner sets up certain transactions in respect of the Hicks note for $10,096 by which the note came into possession of one Harry Lamson, who was, it is alleged, "associated with Kinnear & Masters and the Metropolitan Loan & Trust Company." Masters was an officer of the trust company, and Kinnear was its treasurer and also an officer of the appellant Modern Workmen of the World. Petitioner alleged that Kinnear & Masters and the Metropolitan Loan & Trust Company, on demand made by him for the delivery of the Hicks notes, answered that Widdup was indebted to them in the sum of $33,000. He also alleged that in March, 1912, Kinnear & Masters foreclosed the trust given to secure the Hicks notes, and one of them became the purchaser for the sum of $20,100, and delivered to the trustee in payment therefor the two Hicks notes. He also alleges that upon proper accounting between Widdup and Kinnear & Masters and the Metropolitan Loan & Trust Company, it would appear that Kinnear & Masters and the trust company had no title to the bonds, as the entire obligation due from Widdup had been paid.

Appellant Metropolitan Loan & Trust Company answered, setting up the facts relating to the issue of the bonds, and alleged, among other things, that "S. N. Widdup, who was the secretary of the said District Concrete Company, had, with the full authority and consent of the said District Concrete Company, and in pursuance of a resolution to that effect, pledged the said bonds for the purpose of raising money for satisfying the company's obligations. That in due course, the said forty bonds came into the hands of this respondent for value, and were by this respondent redeemed from Arms & Drury, with whom the said Widdup had pledged them as collateral. That the said bonds were obtained by this respondent as collateral to secure the promissory notes of the said Widdup, amounting

to about nine (9) thousand dollars, and, default being made in payment of the said notes, were sold as collateral and purchased and held by this respondent." The right of Gittings to intervene is challenged on the ground that, so far as this proceeding is concerned, it only contemplates a distribution of the net proceeds of the sales between the holders of the bonds; that it is immaterial whether it holds the bonds as collateral or owns them, it is entitled to $^{49}\!\!/_{100}$ of the net proceeds of the sale, and that if Widdup, or Gittings as his assignee, wishes an accounting between Widdup and his creditors, it should be in a separate proceeding.

Notwithstanding this objection, the court enlarged the order of reference to the auditor, and provided, in respect of the bonds, that it be amended to read as follows: "And to ascertain and state the legal and equitable owners and holders thereof, and what priorities between themselves, if any, should be accorded the owners and holders of such bonds and interest coupons."

The claim of appellant Modern Workmen of the World to a *pro rata* distribution of the proceeds of the sale to the extent of eight bonds deposited with it as collateral for a loan of $2,000, and subsequently purchased by it on sale of the bonds as collateral, was duly presented and considered in the auditor's report.

The auditor filed a report in which, among other things, he held: "It is clear from the testimony of all the parties in interest that Lamson, in all the transactions by which he raised money for Widdup, was acting as Widdup's agent; and that the various parties with whom Lamson dealt knew that Lamson was acting for Widdup. Kinnear so specifically admitted (test. p. 93). This being so, Widdup and his assignee have the right to the benefit of the reduction of Widdup's debt by reason of the usury on the various transactions. Upon an accounting between Widdup and Kinnear & Masters on this basis, it will be seen that the value of the other securities of Widdup obtained by Kinnear & Masters and applied to their use, the Hicks notes, and the National Stone & Brick Company

note, is in excess of his indebtedness, and the bonds held by them as collateral are necessarily released and the property of Widdup and his assignee. The Metropolitan Loan & Trust Company and the Modern Workmen of the World are in no better position than Kinnear & Masters. Even if Kinnear & Masters are not in fact practically the corporations themselves, they are officers of the corporations, and the latter are consequently chargeable with notice of the agency of Lamson for Widdup and so with the usury. It is immaterial, therefore, for the purposes of this case whether Kinnear & Masters, or the corporations they represent, are the actual holders of the obligations of Widdup and the collateral for the same.  *  *  *  It is equally clear to my mind that, by reason of the facts of the authorization of the defendant corporation to Widdup to raise moneys on these bonds, the raising of such moneys by him on his personal obligations, application of such moneys, as well as his own moneys, to the uses of the corporation, and the taking over of the company's obligations for which its bonds were pledged by the substitution of his own obligations, all as the duly authorized agent and officer of the corporation, he is, upon the recovery of these bonds, entitled by subrogation to receive the *pro rata* share of the fund in this case distributable thereon, especially in view of the fact that, as shown by the audit of the company's affairs, exhibiting the admitted indebtedness of the company to Widdup, part of that indebtedness is shown to be the loans for which Widdup pledged these bonds as collateral. I therefore distribute to Widdup's assignee on these bonds presented by Kinnear & Masters representing the Metropolitan Loan & Trust Company and the Modern Workmen of the World."

Without stopping to consider the propriety of converting an action for foreclosure into an omnibus proceeding for a general accounting between an officer of the debtor corporation and his creditors, involving all sorts of collateral transactions, we will proceed to what we conceive to be the root of the inquiry,—appellants' title to the bonds, and the foreclosure of the Hicks property.

While there are a number of appellees, the appeal is chiefly between appellants and Gittings, assignee of Widdup, who was awarded in the decree of the court $9,802.98, which sum is claimed by appellants as their several interests may appear. The other appellees were brought up for the proper adjudication of matters of costs should the decree be reversed. The appeal, therefore, may be disposed of as one between appellants and appellee Gittings.

We are not in accord with the auditor in holding that Lamson was the agent of Widdup in these transactions. Both Lamson and Widdup testified that Lamson was a note-broker dealing with Widdup as a principal.

Widdup testified on this point as follows:

Q. Mr. Widdup, was Mr. Lamson at any time acting as your agent?

A. I never regarded him as an agent.

Q. Did you ever authorize him to do anything for you in relation to securing loans from other people?

A. I knew he did secure loans from other people, but I never in my recollection authorized him where he should place any loans for me. I always dealt with him and regarded him as a principal.   *   *   *

Q. What did you regard Mr. Lamson in that transaction?

A. I regarded him as a money broker.

Q. Not as your agent?

A. No, sir.

Lamson testified as follows:

Q. Mr. Lamson, were you at any time, in any of these transactions with Messrs. Masters & Kinnear, acting for Widdup as his agent?

A. No.

This testimony is not contradicted. The auditor found the relation of agency from a statement in the testimony of Kin-

near respecting the negotiation of the loan with appellant Modern Workmen, where the question was asked:

"Q. Did Mr. Widdup negotiate the loan in person or through an agent?"—to which he answered: "No. He negotiated it through Mr. Lamson."

The indefinite statement of Kinnear, in view of the positive testimony of both Widdup and Lamson, is not sufficient to support the inference of agency. With Lamson as a principal, the case is somewhat simplified.

We find nothing in this record to impugn the title of appellant Modern Workmen of the World to the eight bonds of the par value of $4,000. It appears that this company, a fraternal insurance company, loaned Widdup $2,000, paying him that amount in cash, for which it received his negotiable promissory note for $2,000, bearing interest at the rate of 6 per cent per annum, payable on demand, with an agreement attached by which the eight bonds in question were deposited as collateral security for the payment of the note, with full authority, in case of default, to make sale of the bonds, and with the further provision that the holder thereof "may purchase all or any part of said securities discharged from any right of redemption."

Widdup defaulted, the bonds were sold, and purchased for the company in whose possession they were when presented to the court for participation in this proceeding. This loan was without usury or commission to anyone, and it matters not that it was negotiated through the agency of its officer, Kinnear. The proceeds of the loan were applied as a credit on a note of Widdup's or the concrete company's, which bore the indorsement of one Fahrney, an officer of the company. There is nothing to show that the company, either directly or by authority to its agent, was guilty of conduct which would taint its title to the bonds. As to appellant Modern Workmen of the World, the judgment against it in favor of Gittings, as assignee, will be vacated, and it will be awarded the *pro rata* share of the proceeds in the hands of the trustees for distribution to the extent of the eight bonds and the coupons held by it.

The Hicks notes were secured by a second deed of trust on

certain real estate. They were payable to one Yourtree, who was the vice president of the District Concrete Company. Widdup and Yourtree were named as trustees in the deed of trust. The $10,000 note was held by one Farris as security for a $2,400 note sold to him by Lamson, and the $10,060 note was held by Arms & Drury. as security for a note of Lamson for $3,800. Lamson redeemed the Hicks notes by paying the obligations to Farris and Arms & Drury, and then sold the notes to the Metropolitan Loan & Trust Company for $8,247, which was paid in notes and cash. The name of Widdup appeared nowhere on these notes, and the trust company claims to have purchased them on the open market without notice of any claim of ownership in Widdup. On this point there is a sharp conflict and endless confusion in the evidence. But it is not clear from the subsequent transactions in just what way notice to the trust company will benefit Widdup or his assignee.

On April 12, 1912, the Metropolitan Loan & Trust Company, through its agents Kinnear & Masters, demanded a foreclosure of the trust by the trustees Widdup and Yourtree. Yourtree refused to permit the foreclosure unless his brother, who was an indorser on the notes, should be protected. To protect him, it was agreed that the Metropolitan Loan & Trust Company should bid the property up to $20,100, or $4 in excess of the face value of the notes, and that the consideration for the purchase of the property should be paid by cancelation and delivery of the notes. That such an arrangement was made is admitted by Gittings in his brief, where it is stated that he "knew that the sale would occur and understood Masters & Kinnear would bid up to $20,100, the amount of these notes." With this understanding, the sale was conducted by Widdup, who accepted the canceled notes in payment, without a word of protest or claim of ownership in the notes either by him or his assignee, Gittings. We think they are estopped to claim any such equitable interest in the notes as would entitle them to credit for the difference between the actual purchase price of the notes and the price for which the property was bid in at the foreclosure sale. Widdup by his conduct is now estopped to

say that Lamson had no authority to sell the notes. The rule is well settled that when one stands by and sees a third person selling property under claim of title, without asserting his own, he is estopped thereafter to set it up. *Close* v. *Glenwood Cemetery,* 107 U. S. 466, 27 L. ed. 408, 2 Sup. Ct. Rep. 267; *Kirk* v. *Hamilton,* 102 U. S. 68, 26 L. ed. 79; *Baker* v. *Humphrey,* 101 U. S. 494, 25 L. ed. 1065.

Still more positive is the rule where the one conducting the sale subsequently attempts to assert title. Gittings is in no better condition, since he stands in the shoes of Widdup, and, knowing of the sale, interposed no objections. It would be peculiar equity which would permit a person claiming equitable title in securities to induce a holder thereof for value, as an accommodation, to purchase the property sold for the satisfaction of the securities at a price far in advance of the amount invested, and then come into a court of equity to compel indemnity for the difference. It is unnecessary to inquire into the title of Lamson when he sold these notes to appellant trust company, since Widdup and Gittings are estopped from setting up adverse title in this proceeding.

Coming now to the claim of appellant Metropolitan Loan & Trust Company to the forty bonds here involved, it appears from the testimony of Widdup that about June 15, 1910, the District Concrete Company, by proper resolutions, authorized him to borrow $20,000 from Arms & Drury and hypothecate the bonds of the company as collateral, and that, pursuant to the authority thus given, the loan was made, notes were executed therefor, and bonds of the company delivered as collateral for payment of the notes. A large balance remaining due Arms & Drury, which Widdup or his corporation was unable to meet, Widdup entered into an agreement with Lamson and Masters & Kinnear whereby he gave three notes of $2,966.33 each, one of the notes to Lamson, one to the Metropolitan Loan & Trust Company, and one to the National Investment Company, in consideration of which they were to assume the obligation to Arms & Drury and hold the forty bonds as collateral security for the payment of the notes.

The notes signed by Widdup dated April 12, 1911, were in usual form, negotiable, bearing interest at the rate of 6 per cent per annum, payable two months after date, with an agreement that the bonds should be held as collateral to secure their payment, "and also as collateral security for all other present or future demands of any and all kinds." Provision was made upon default in payment of the notes for the sale of the bonds, with the express provision "that upon the sale of any of the said collaterals, the holder of this obligation, at its option, may become the purchaser thereof, and hold the same therefor in its own right, absolutely free from any claim of the undersigned."

On the same day these notes were given, Widdup, on behalf of the concrete company, addressed the following communication to Arms & Drury:

Tacoma, D. C., April 12, 1911.

Messrs. Arms & Drury,
    Washington, D. C.,
Gentlemen:—

Upon payment of our notes to you of $7,400 and interest, you are authorized to deliver the collateral namely, 40 bonds of the District Concrete Company Nos. 65 to 100 inclusive and Nos. 23, 30, 31, and 36 respectively to Mr. H. Lamson.

Respectfully,

District Concrete Company,
                    S. N. Widdup, Secretary,

It appears that on April 12, 1911, the forty bonds in question were in the possession of Arms & Drury as collateral security for an indebtedness amounting at that date, not to $7,400, as stated in the letter, but to $8,400. The Metropolitan Loan & Trust Company, the National Investment Company, and Lamson, each agreed to assume one third of this indebtedness. According to agreement, Arms & Drury were paid $1,540, reducing their claim to $7,000. The three parties— Masters on behalf of the National Investment Company, Lam-

son for himself, and Kinnear for the Metropolitan Loan & Trust Company—then executed their note to Arms & Drury for $7,000, secured by the forty bonds. Widdup, to secure this, in turn executed the three notes for $2,966.33 each, totaling $8,900. To secure these, Widdup put up the forty bonds. There being three separate notes to separate parties, the collateral agreement in each note embraced only its relative proportion of the bonds. For example, in the Lamson note, the only one printed at length in the record, thirteen of the bonds by number were mentioned as collateral security for its payment. The three notes were therefore given to cover the $8,400 due Arms & Drury, together with $500 commission, $140 of which went to Arms & Drury, and the remaining $360 to the three parties to whom Widdup gave his notes. By the terms of the agreement, Arms & Drury, when paid the $7,000 note, were to turn over the bonds to the holders of the three notes.

On June 15, 1911, after due notice had been given by publication, the forty bonds were sold on account of the National Investment Company, the Metropolitan Loan & Trust Company, and Lamson, by Thomas J. Owen & Son, general auctioneers, and purchased by Masters for $6,600, which was paid in cash. After deducting a commission of $10 and $4.32 for expense of publishing notice, Owen & Son gave their check for the balance, $6,585.78, to the National Investment Company, the Metropolitan Loan & Trust Company, and Lamson. By indorsement on the notes, each was credited with one third of this amount,—$2,195.22. Checks of the Metropolitan Loan & Trust Company to Arms & Drury to the amount of $6,852.40 were produced and appear in the record. Presumably these were given in payment of the note to Arms & Drury, and cleared up the balance of Widdup's indebtedness to that firm, and released the bonds as collateral for the three Widdup notes. The Metropolitan Loan & Trust Company, having satisfied Arms & Drury, took over the note held by Lamson, the note held by the National Investment Company, and the bonds from Masters; hence, it now not only owns the bonds, but the notes subject to the above credit.

It is, however, contended that the holders of the notes could not become purchasers of the collateral. The holders of the notes did not purchase the bonds at the sale; they were bid in by Masters. But assuming, as may be inferred, that Masters was acting as the agent of the payees and holders of the notes, by the terms of the collateral agreement the holders of the notes, in case of default, were not only authorized to sell the collateral, but to become purchasers of it. This was a perfectly legal and enforceable agreement. *Hiscock* v. *Varick Bank,* 206 U. S. 28, 51 L. ed. 945, 27 Sup. Ct. Rep. 681; *Fidelity Ins. Trust & S. D. Co.* v. *Roanoke Iron Co.* 81 Fed. 439; *Farmers' Nat. Bank* v. *Venner,* 192 Mass. 531, 78 N. E. 540, 7 Ann. Cas. 690; *Manning* v. *Shriver,* 79 Md. 41, 28 Atl. 899. It is therefore a matter of no importance that Masters purchased the bonds either as agent or as an officer of appellant trust company and of the National Investment Company, since he only did what the holders of the notes could have done themselves.

It matters not that up to the time of the sale the bonds were still in the possession of Arms & Drury. They delivered them on the day of the sale to Owen, the auctioneer, in whose possession they were when sold. The bonds in the possession of Arms & Drury, after the note for which they were held as collateral had been paid, were a valid collateral for the three notes, at least, between the parties. Arms & Drury are estopped at this late date to lay claim to them, or to assert any further claim against Widdup, and Widdup or his assignee is not in position to contest the title to the bonds merely upon the ground of their technical possession prior to the date of the sale. If, as contended, Arms & Drury have not been paid, that is a matter between them and the makers of the note which they took in lieu of Widdup's indebtedness to them, and is of no importance in this case. Widdup is clear of Arms & Drury.

We are disposed to treat the forty bonds as a separate transaction. They were hypothecated for the express purpose of securing the payment of the three notes aggregating $8,900. They were regularly and legally sold, and failed to bring by more than $2,000 sufficient to satisfy the collateral notes. For

this balance Widdup is liable in any further accounting between the assignee and the Metropolitan Loan & Trust Company. The difficulty arose below in treating Lamson as the agent of Widdup, and Kinnear & Masters and appellants the Workmen and the trust company as a single entity. Where Kinnear & Masters acted as agents for these corporations, of course, the corporations are liable for their acts. But it by no means follows that the corporations are liable for the individual acts of Kinnear & Masters, when they were acting on their own account. It is here that error was committed below in conducting an accounting between Widdup and Masters & Kinnear involving a multitude of transactions, extending through several years, and charging up to the appellant corporations amounts found to be due from Kinnear & Masters to Widdup, which should have been involved in a separate accounting between those parties, independent of the corporations.

As to the remaining bonds presented for participation by the Metropolitan Loan & Trust Company, bonds numbered 21 and 25 were held as collateral for two notes dated May 16, 1911, for $400 each. These collateral notes, executed by Widdup, were in usual form, with full power in default of payment to sell the collateral. These bonds were sold and purchased by Masters for the trust company. As to these bonds the Metropolitan Loan & Trust Company is the owner and entitled to participate in the distribution of the proceeds in the hands of the trustees to the extent of the *pro rata* share of the two bonds. Bonds numbered 22 and 28 were hypothecated as collateral for a note for $300, dated August 2, 1911, signed by one Samuels, and payable to the order of Widdup. His note was purchased by the trust company for $275. The note was purchased in the open market, presumably at its market value. On default the bonds were sold and purchased by Kinnear for the Metropolitan Loan & Trust Company. The trust company, as owner of these bonds, should participate in the distribution of the funds in the hands of the trustees to the extent of the *pro rata* share of the bonds. As Widdup parted with title to the note and collateral in due course, and the bonds were sold as collateral, the bonds

have no place in an accounting between Gittings and the trust company.   Bonds numbered 34 and 35 were purchased in the open market from one Duke, and paid for by a check of the Metropolitan Loan & Trust Company.   The assignee of Widdup has no claims whatever upon these bonds, and full participation should be awarded the trust company. ·

Appellant Metropolitan Loan & Trust Company is held to be the owner of the forty-four bonds sold as collateral and the two bonds purchased from Duke.   Therefore, the judgment against it in favor of Gittings, as assignee, will be vacated, and it will be awarded the *pro rata* share of the proceeds in the hands of the trustees for distribution to the extent of the said forty-six bonds and the coupons held by it.

We now come to the charges of usury.   The auditor seems to have opened an accounting between Kinnear & Masters and Widdup and Lamson, and charged up usury as an offset against the indebtedness due not only Kinnear & Masters, but appellant corporations.   In many instances usury was charged for commissions on notes which had been paid and canceled.   It is settled law that a defense of usury good against one obligation will not constitute a valid offset against a distinct and independent obligation, though between the same parties.   *Lennig's Appeal,* 93 Pa. 301; *Polen* v. *Palmer,* 53 Ill. App. 223.   The rule is well stated in *Dickey* v. *Permanent Land Co.* 63 Md. 170, where usury paid on two mortgages was attempted to be set up as an offset against a third mortgage, as follows: "But the law never makes an application of payment when the parties have already done so.   The law will not undertake to make a new contract for the parties.   And this rule strictly governs, even in the case of an application of money to the payment of an item in an account current which is not recoverable in an action at law."   The court quoted with approval from *Tomlinson Carriage Co.* v. *Kinsella,* 31 Conn. 268, as follows: "The party receiving money as the consideration of an illegal sale may under the statute be liable to refund it.   But to apply it by law as payment to other lawful debts is, in effect, to make a new contract for the parties against their wishes and inten-

tions, and different from that which the law raises from the circumstance that the money may be recovered back under the statute."

Until the adoption of our Code, usurious interest could only be recovered by a separate action brought within one year. *Carter* v. *Carusi,* 112 U. S. 478, 28 L. ed. 820, 5 Sup. Ct. Rep. 281; *Lawrence* v. *Middle States Loan Bldg. & Constr. Co.* 7 App. D. C. 161. But now if suit is brought on the principal debt after payment of usurious interest, such usury may be made a valid set-off against the principal debt. Usury upon obligations paid and canceled cannot be used as a set-off against a subsequent obligation even between the same parties, either in law or equity. The party claiming relief from the usurious contract, having failed to claim an offset against the enforcement of that particular contract, has his remedy at law to recover back the amount prescribed by statute as the penalty for usury. It follows, therefore, that if Widdup or Gittings, as assignee, ever had any right to compel defendants to account for usury on prior closed transactions, they had, within the period fixed by the statute of limitations, a complete and adequate remedy at law. In the present case the provisions of the statute were totally ignored. Commissions, discounts, and renewal commissions and discounts resulting from the renewal of notes and the purchase of notes in the open market, not only by appellants, but by Lamson and Kinnear & Masters, regardless of primary indebtedness or the statute of limitations, were grouped as usury and charged as an offset against the claims of appellants.

Many of the transactions involved the purchase of Widdup's notes in the open market at a heavy discount below the face value. Subsequent developments seem to justify the discount. Negotiable notes, bonds, and commercial paper are a marketable commodity, and are worth just what they will bring in the market, irrespective of face value. Their value depends upon the redemptive capacity of the maker or indorser or the value of the collateral by which they are secured, and the difference between the face value and the price realized on the market

cannot be distorted into usury. Hence, the system of accounting here adopted by the auditor is without legal support.

To the Workmen of the World notes, it is not contended that usury on any theory is traceable. The two $400 notes, for which bonds numbered 21 and 25 were collateral, were purchased by the Metropolitan Loan & Trust Company; hence, usury in the original or renewal transactions could not be charged against it. If not barred by the statute of limitations, the $120 commission charged by appellant trust company on the note given it by Widdup for $2,966.33 would be a valid offset against an action on the note. As to the other two notes, the trust company is the purchaser of the notes and of the bonds sold as collateral, and is not therefore liable for usury on the primary obligation.

Gittings stands in the shoes of Widdup. The assignment was made when Widdup was preparing to abscond to escape his creditors. In this situation, the assignee stood by and permitted the creditors of Widdup to create the conditions of which he now complains. The intervening petition was not filed until eighteen months after the assignment, over sixteen months after the sale of the bonds, fifteen months after the bill was filed for the foreclosure of the concrete company trust, and eight months after the foreclosure of the Hicks trust. The obligations here involved had all been incurred prior to the assignment. True, the sale of the bonds and the foreclosure of the Hicks trust occurred subsequent to the assignment; but the contracts authorizing the sale and foreclosure were in existence when the assignment was made; hence, the burden shifted to Gittings of rescuing the bonds and the Hicks land from sale. Failing in this, he is in the same plight Widdup would have been had there been no assignment. The assignment, therefore, in no way affects the rights of appellants. *Colbert* v. *Baetjer,* 4 App. D. C. 416.

In the decree the court below awarded judgment against appellants in favor of Gittings, assignee, for the costs incurred in the proceedings before the auditor incident to the intervention of Gittings. We perceive no equitable reason why these costs

should be paid out of the funds held for distribution, since it would entail a burden upon innocent bondholders, nor should appellants be compelled to contribute to an expense for which they were not responsible. The decree as to said costs is vacated, and the court is directed to assess the same against appellee Gittings, as assignee.

The decree is reversed, with costs, and the cause is remanded with directions to vacate the decree heretofore entered and to enter a decree in accordance with this opinion.

*Reversed and remanded.*