# REAGAN *v.* DISTRICT OF COLUMBIA.

---

STATUTES; "LOAN SHARK LAW;" "SECURITY;" CONSTITUTIONAL LAW; CLASS LEGISLATION; APPEAL AND ERROR.

1. The act of Congress of February 4, 1913 (37 Stat. at L. 657), making it unlawful to engage in the District of Columbia in the business of loaning money on security at more than 6 per cent interest, without obtaining a license, will not be strictly construed as a penal statute, but, being a remedial act, will be liberally construed, with a view of giving force and effect to the intent of Congress.

2. A promissory note given by a borrower to a lender is a "security" within the meaning of the act of Congress of February 4, 1913 (37 Stat. at L. 657, chap. 26), making it unlawful to engage in the District of Columbia in the business of loaning money at more than 6 per cent interest, on security of any kind, direct or collateral, tangible or intangible, without procuring a license. (Citing *Newman* v. *United States ex rel. Prender, ante,* 37.)

3. It is within the power of Congress, in prescribing legal rates of interest, to make general classifications, and, so long as a general class of property is embraced within a single classification, and there is no discrimination in favor of persons or property within the same classification, it infringes no constitutional right.

4. For the purpose of classifying the persons to be governed by a statute regulating an occupation, the legislative body may take into consideration the manner in which the particular occupation discriminated against has been conducted, the character of the persons usually engaged in it, as well as the frailties and necessities of those attracted to it, for whose protection the restriction is made.

5. The act of Congress of February 4, 1913 (37 Stat. at L. 657, chap. 26),

making it unlawful to engage in the District of Columbia in the
business of loaning money upon security at more than 6 per cent
interest, without obtaining a license, involves no unconstitutional
classification by reason of the fact that it excepts the legitimate
business of national banks, licensed bankers, trust companies, savings
banks, building and loan associations, and real estate brokers.

6. A writ of error from the Supreme Court of the United States to this
court will not lie in a criminal case, although the applicant therefor
was convicted under a statute, the constitutionality of which is in-
volved in the case.   (Citing *Pierce* v. *United States*, 37 App. D. C.
582.)

No. 2573.   Submitted December 1, 1913.   Decided February 2, 1914.

IN ERROR to the Police Court for the District of Columbia.
*Judgment affirmed.*

The COURT in the opinion stated the facts as follows:

This action arose in the police court of the District of Colum-
bia upon a criminal information charging Bernard Reagan,
plaintiff in error, hereafter referred to as defendant, with a vio-
lation of the provisions of the act of Congress approved Febru-
ary 4, 1913 (37 Stat. at L. 657, chap. 26), commonly known as
the "Loan Shark Law."

The information is in three counts.   In the first count, de-
fendant is charged with making a loan to one Joseph P. Cullen
and one Robert E. Bender, in the sum of $245 for one month,
and receiving therefor $5, being a greater rate of interest than
6 per cent per annum, and receiving as security for the said loan
the joint and several promissory note of said Cullen and Ben-
der.   The second count charges defendant with making a loan
of $24.50 to one Dillon for one month, for which he charged 50
cents interest, being a rate of more than 6 per cent per annum,
and receiving as security for said loan a promissory note of the
said Dillon, which note was indorsed by one Reagan.   In the
third count defendant is charged with making a loan to one
Quigley in the amount of $24.50 for one month, for which he
charged 50 cents interest, being a greater rate of interest than

6 per cent per annum, and receiving as security for said loan the promissory note of said Quigley. It also charges that defendant had not, at the time of making the loans, procured a license as required by law.

Defendant demurred to the information on the ground that it did not charge an offense within the statute. The demurrer was overruled, and defendant was convicted upon each of the three counts. The case is here on error to the police court.

*Mr. James S. Easby-Smith* for the plaintiff in error.

*Mr. Conrad II. Syme,* Corporation Counsel, and *Mr. Robert L. Williams,* Assistant, for the defendant in error.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

The act of Congress provides, among other things, "that hereafter it shall be unlawful and illegal to engage in the District of Columbia in the business of loaning money upon which a rate of interest greater than six per centum per annum is charged on any security of any kind, direct or collateral, tangible or intangible, without procuring license; and all persons, firms, voluntary associations, joint-stock companies, incorporated societies, and corporations engaged in said business shall pay a license tax of five hundred dollars per annum to the District of Columbia. * * * That no such person, firm, voluntary association, joint-stock company, incorporated society, or corporation shall charge or receive a greater rate of interest upon any loan made by him or it than one per centum per month on the actual amount of the loan, and this charge shall cover all fees, expenses, demands, and services of every character, including notarial and recording fees and charges, except upon the foreclosure of the security. The foregoing interest shall not be deducted from the principal of loan when the same is made. * * * No such loan greater than two hundred dollars shall be made to any one person. * * * That in any foreclosure on any loan made under this act no charges for attorneys' or

agents' fees shall be made or collected which will exceed ten per centum of the amount found due in such foreclosure proceeding. * * * That nothing contained in this act shall be held to apply to the legitimate business of national banks, licensed bankers, trust companies, savings banks, building and loan associations, or real estate brokers, as defined in the act of Congress of July first, nineteen hundred and two." [37 Stat. at L. 657, chap. 26].

Aside from an attack upon the constitutionality of the act, the sole question presented is whether or not a promissory note is a "security" within the contemplation of the language, "any security of any kind, direct or collateral, tangible or intangible?"

It is urged that this is a penal statute, and, as such, the somewhat obsolete rule of strict construction should be invoked. It is a remedial act, and should be liberally construed, with the view of giving force and effect to the intent of Congress. In arriving at that intent, it is proper to consider the evils sought to be regulated and the advisability of bringing the wrong, in all of its ramifications, within the limitations of the act. To this end, the intent of the law makers must be gathered from the law as a whole, and not from garbled extracts. This is not a usury statute as applied to the regulation of interest charges for the use of money in legitimate commercial transactions, but an act licensing, under limitations and restrictions, the loaning of money in small sums upon personal security.

In special statutes of this sort, where a particular remedy is sought or a wrong is to be restrained, the word "security" has been applied in its broad sense to include a promissory note. *Taylor* v. *Pickett,* 52 Iowa, 467, 3 N. W. 514; *Wagner* v. *Scherer,* 89 App. Div. 202, 85 N. Y. Supp. 894; *Jennings* v. *Davis,* 31 Conn. 134; *Duncan* v. *Maryland Sav. Inst.* 10 Gill & J. 299; *Stickel* v. *Atwood,* 25 R. I. 456, 56 Atl. 687. The present act, however, specially defines the securities included within its terms as "any security of any kind, direct or collateral, tangible or intangible." Without stopping to inquire whether the term "intangible" security is broad enough to include every evidence of debt, we have no doubt of its including any evi-

dence of debt executed by a debtor which will make the payment of money more assured or more easily enforced. We find no difficulty, therefore, in including a promissory note within this general classification.

Congress is here dealing with a subject which it is seeking to regulate generally and without apparent exception. To this end broad terms have been used to express its comprehensive intent. The court, therefore, in interpreting the act will not close its eyes to that which, as a matter of common knowledge, led to the enactment of the law. "There has been much public complaint attending the lending of money in the District of Columbia, in comparatively small sums, upon pledge or other security, by persons engaged in the business. * * * It is to be borne in mind that the act of 1889 was intended to apply to pawnbrokers exclusively, and its definition was necessarily precise, so as not to include others lending money in small sums upon security generally; whereas the description of the present act was broadened so as to include all." *Newman* v. *United States ex rel. Prender, ante,* 37.

The constitutionality of the act is assailed upon the ground that it discriminates in favor of "national banks, licensed bankers, trust companies, savings banks, building and loan associations, or real-estate brokers." The act, as above suggested, is not intended to regulate the rate of interest to be charged generally in the legitimate business of loaning money in this District, but to regulate interest rates in the loaning of small sums of money, which had heretofore been conducted in such a manner as to impose grievous burdens upon a class of persons least able to bear them. The wrong to be remedied is such as to bring the subject within the exercise of the police power of Congress. In *Newman* v. *United States, supra,* the court said: "The business of lending money in small sums upon pledge or security is one within the police power, and subject not only to license, but also to regulation for the prevention of mischiefs attending it. *State* v. *Hurlburt,* 82 Conn. 232, 72 Atl. 1079; *Griffith* v. *Connecticut,* 218 U. S. 563, 570, 571, 54 L. ed. 1151, 1154, 31 Sup. Ct. Rep. 132. * * * In determining whether the classifica-

tion is reasonable or arbitrary 'Not only the final purpose of
the law must be considered, but the means of its administration,
—the ways it may be defeated.' *St. John* v. *New York,* 201
U. S. 633, 637, 50 L. ed. 896, 898, 26 Sup. Ct. Rep. 554, 5
Ann. Cas. 909. The purpose of the act under consideration was
to cure mischiefs resulting from money lending of the kind
defined, through former inefficient, or want of, regulation."

In any event, it is within the power of Congress, in prescrib-
ing legal rates of interest, as in the subject of taxation, to make
general classifications, and, so long as a general class of prop-
erty or individuals is embraced within a single classification,
and there is no discrimination in favor of persons or property
within the same classification, it cannot be successfully urged
that there has been an infringement of constitutional rights. In
*State ex rel. Dawson County* v. *Farmers' & M. Irrig. Co.* 59
Neb. 1, 80 N. W. 52, the general rule of classification is stated
as follows: "The rule established by the authorities is that,
while it is competent for the legislature to classify, the classifi-
cation, to be valid, must rest on some reason of public policy,
some substantial difference of situation or circumstances, that
would naturally suggest the justice or expediency of diverse leg-
islation with respect to the objects classified."

We think the right of the state to discriminate goes further.
It may not only limit or abolish the acknowledged evil, but it
may take into consideration the manner in which the particu-
lar occupation discriminated against has been conducted, the
character of the persons usually engaged in it, as well as the
frailties and necessities of those attracted to it for whose pro-
tection the restriction is made. In the case of *Patsone* v. *Penn-
sylvania,* 232 U. S. 138, 58 L. ed. —, 34 Sup. Ct. Rep. 281,
the constitutionality of a statute of Pennsylvania was involved
which made it unlawful for any unnaturalized foreign-born resi-
dent to kill any wild bird or animal, except in defense of person
or property, and to. that end made it unlawful for such foreign-
born person to be possessed of a shotgun or rifle, with a penalty
of $25 and a forfeiture of the gun or guns. Mr. Justice
Holmes, in holding the statute constitutional, said: "The dis-

crimination undoubtedly presents a more difficult question. But we start with the general consideration that a State may classify with reference to the evil to be prevented, and that if the class discriminated against is or reasonably might be considered to define those from whom the evil mainly is to be feared, it properly may be picked out. A lack of abstract symmetry does not matter. The question is a practical one, dependent upon experience. The demand for symmetry ignores the specific difference that experience is supposed to have shown to mark the class. It is not enough to invalidate the law that others may do the same thing and go unpunished, if, as a matter of fact, it is found that the danger is characteristic of the class named. *Lindsley* v. *Natural Carbonic Gas Co.* 220 U. S. 61, 80, 81, 55 L. ed. 369, 378, 379, 31 Sup. Ct. Rep. 337, Ann. Cas. 1912C, 160. The State 'may direct its law against what it deems the evil as it actually exists, without covering the whole field of possible abuses.' *Central Lumber Co.* v. *South Dakota,* 226 U. S. 157, 160, 57 L. ed. 164, 169, 33 Sup. Ct. Rep. 66; *Rosenthal* v. *New York,* 226 U. S. 260, 270, 57 L. ed. 212, 216, 33 Sup. Ct. Rep. 27; *L'Hote* v. *New Orleans,* 177 U. S. 587, 44 L. ed. 899, 20 Sup. Ct. Rep. 788."

In the present case, the statute not only includes in its classification every class of security, but it sharply classifies the persons who, after securing a license, may enjoy the special privileges granted by the act. The classification is of that general character which brings the act within the legislative power, and authorizes its exercise within well-defined limitations of the Constitution.

The judgment is affirmed.                    *Affirmed.*

An application by the appellant for a writ of error, from the Supreme Court of the United States was denied February 13, 1914, Mr. Chief Justice SHEPARD delivering the opinion of the Court:

Bernard Reagan was convicted in the police court. On writ of error granted by this court the judgment has been affirmed.

He now claims the right of review of the judgment in the Supreme Court of the United States, on the ground that the case involves the constitutionality of the act under which the conviction was had.

Being a criminal case the judgment of this court is final. *Pierce* v. *United States,* 37 App. D. C. 582, 588, s. c. 223 U. S. 732, 56 L. ed. 634, 32 Sup. Ct. Rep. 528.

The petition for writ of error is *denied.*